# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **REYNOLD BENJAMIN,** | ) |
| Plaintiff, | ) |
| v. | ) No. 09 C 5019 |
| **ILLINOIS DEPARTMENT OF FINANCIAL and PROFESSIONAL REGULATION, DEAN MARTINEZ, JOHN HARRIS and BRENT ADAMS,** | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Reynold Benjamin, a former supervisor at the Illinois Department of Financial and Professional Regulation ("IDFPR"), filed a five-count complaint against IDFPR and defendants Dean Martinez, John Harris and Brent Adams in their official and individual capacities. Plaintiff, who is of Indian descent, alleges he was retaliated against, and ultimately terminated, due to his race and national origin and that he was discriminated and retaliated against for engaging in protected speech under the First Amendment. Plaintiff brings claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*. ("Title VII") (Counts I and II, as to IDFPR), 42 U.S.C. § 1983 for violations of the Fourteenth Amendment's Equal Protection Clause (Count III, as to Martinez and Harris) and First Amendment violations (Count IV, as to Martinez and Harris), and the Illinois State Officials and Employees Ethics Act (Count V, as to all

defendants). Defendants IDFPR, Martinez and Adams's partial motion to dismiss is denied. Defendant Harris's motion to dismiss all counts against him is granted in part and denied in part.

**I.  Background**

Plaintiff is non-Hispanic and of Indian descent. He was hired on August 5, 2002 as the Supervisor of the Currency Exchange Section with the predecessor agency to IDFPR. On December 16, 2005, plaintiff was promoted to Assistant Director for the Bureau of Residential Finance in the Division of Banking and reported directly to the Director of the Division, Jorge Solis, who is Hispanic. In November 2007, plaintiff began an additional temporary assignment maintaining and coordinating a predatory lender database, for which he received "Temporary Assignment Pay" and "Bi-Lingual Pay" based on his knowledge of the Hindi language.

Defendant Martinez, who is Hispanic, is the former Secretary of IDFPR. Defendant John Harris, as then-Governor Blagojevich's Chief of Staff, had supervisory authority over Martinez. He also had authority and responsibility over matters relating to expenditure of state funds, equitable and non-discriminatory employment practices of state government, complaints of ghost pay-rollers, concerns about government waste, and questions on political corruption. Defendant Adams was the IDFPR's Director of Policy and reported directly to Martinez. Adams is currently the Acting Secretary of IDFPR.

Plaintiff alleges that Martinez caused Mario Pantoja and David Espinoza to obtain employment at IDFPR under plaintiff and/or Solis. However, plaintiff claims that Pantoja and Espinoza were permitted to bypass plaintiff's authority and report directly to Martinez. During their employment, Pantoja and Espinoza received preferential treatment, assignments and promotions based on their national origin, political affiliation, and political work performed for allies of Martinez and Governor Blagojevich. According to plaintiff, Martinez accelerated and manipulated Pantoja's and Espinoza's promotions and assignments at IDFPR based on impermissible motivations.

Beginning in 2006, plaintiff criticized Pantoja's and Espinoza's work performance and complained to Solis. Eventually, plaintiff's complaints were brought to the attention of Martinez and Harris. Plaintiff claims he was subjected to discrimination and retaliation based on his race, national origin, and for complaining about his Hispanic subordinates, including Pantoja and Espinoza. In December 2007, Andy Fox, IDFPR Chief of Staff, allegedly threatened to terminate plaintiff and told him that if he wanted to keep his Temporary Assignment Pay, he would have to leave Pantoja and Espinoza alone. During the same time period, plaintiff alleges that Solis informed him that Martinez directed plaintiff to "get along" with Espinoza and Pantoja, "or it would not be good for [plaintiff] and his employment would not work out." Compl. ¶ 24.

On January 18, 2008, a "conflictual interaction" occurred between plaintiff, Pantoja, and Espinoza. *Id*. ¶ 22. Plaintiff alleges that the next day he was discriminated against because Martinez removed his Temporary Assignment Pay. Plaintiff further alleges that he was subjected to a "retaliatory investigation" into his attendance and timekeeping. *Id*. ¶¶ 31-33.

Plaintiff alleges that on April 16, 2007[1], Harris was provided with a memorandum that plaintiff authored, which described "internal staffing problems," including that Pantoja and Espinoza were protected by Martinez and Fox, were not doing their jobs, received preferential treatment, and were "ghost pay rollers." *Id*. ¶ 29. Then, on May 5, 2008, Martinez and plaintiff had a meeting. Plaintiff claims Martinez told him that Harris had received a letter (which plaintiff assumed was his memorandum), and that the letter made Martinez, Solis, and plaintiff look bad. Plaintiff further claims Martinez gave him a "special assignment" that was unfavorable and told him "I could fire you if I want and nobody can stop me," and "Watch what you say, your conversations get back to me." *Id*. ¶ 35.

On May 6, 2008, plaintiff asked Solis to stop the transfer to the "special assignment" because is was "obvious and blatant

---

[1] Plaintiff states in his complaint that this memorandum was dated April 16, 2007. Based on the timeline nature of the complaint, it seems likely that this was a typographical error and the proper date was April 16, 2008.

4

retaliation and a set up for failure." *Id*. ¶ 36. Plaintiff also told Solis that if the "special assignment" was valid, Pantoja was the logical choice. On May 9, 2008, Solis told plaintiff that he had talked to Martinez, but that plaintiff was still tasked with the "special assignment." Plaintiff then wrote a second memorandum on May 10, 2008, in which he claimed Hispanic employees of IDFPR were targeting plaintiff and provided reasons not to transfer him to the "special assignment." On May 19, 2008, Solis informed plaintiff that his transfer was "put on hold." *Id*. ¶ 39.

Sometime between June 6 and 9, 2008, Harris met with Solis to discuss the information in plaintiff's two memoranda, and plaintiff claims that Solis confirmed all the information contained therein. Immediately after that meeting, Harris went to the head of IDFPR, Martinez, to inform him of plaintiff's complaints against IDFPR employees. Plaintiff alleges that a few days after the meeting, on June 9, 2008, Solis sent an email to Harris entitled "I need your help," in which Solis wrote that Martinez called him "sounding very irate" because Solis and Harris had met and also because Solis chose plaintiff over Pantoja and Espinoza. *Id*. ¶¶ 41, 42. Plaintiff further asserts that Solis told Harris that Martinez wanted to run the Division of Banking, which concerned Solis because he enjoyed his role as Director.

Plaintiff alleges that after the meeting between Solis and Harris, Martinez began to retaliate against Solis by removing

5

Solis's authority as Director "in material respects." *Id*. ¶ 45. Plaintiff claims that Harris "acted in concert with and knowingly supported Martinez" and "knowingly permitted" the alleged retaliatory acts against plaintiff and Solis. *Id*. ¶¶ 44, 45.

On June 19, 2008, Solis informed plaintiff that he had to complete Espinoza's performance evaluation. After Espinoza completed a draft evaluation with a favorable rating, plaintiff wrote to Solis, stating that he believed Espinoza deserved a lower rating, but he feared retaliation if he gave Espinoza a poor rating. Ultimately, plaintiff refused to sign Espinoza's evaluation.

On June 24, 2008, plaintiff's "Bi-Lingual Pay" was removed. On June 30, 2008, plaintiff submitted a complaint to Governor Blagojevich's Office of Inspector General ("OIG") against Martinez, alleging "hiring improprieties, nepotism, racial discrimination, possible ghost pay rolling, political pressure to help (Hispanic) campaigns on the weekends, promotions to friends and relatives (Hispanic) due to political affiliation." *Id*. ¶ 48. Plaintiff also complained to OIG about Martinez's threat to fire him, Pantoja's and Espinoza's absences, and perceived retaliation against him and Solis. On July 30, 2008, plaintiff met with OIG personnel about his complaint. That same day, plaintiff asserts, Adams "cited a particular objection to and undue criticism of" his whereabouts. *Id*. ¶ 55.

Plaintiff claims that throughout July 2008, he provided information to the Federal Bureau of Investigation about his concerns of "questionable personnel and political practices." *Id*. ¶ 52. On July 17, 2008, plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging discrimination based on race and national origin, and retaliation. Plaintiff alleges Adams admitted that after plaintiff filed his first EEOC Charge, Martinez gave Adams responsibility to develop a recommendation on a "course of action" with respect to plaintiff to present to the Governor's office for approval. *Id*. ¶ 56.

On July 31, 2008, Harris was away from the Governor's office on a scheduled absence. In his absence, Adams contacted the Governor's Deputy Chief of Staff, Mireya Hurtado, who is Hispanic, and recommended that plaintiff be terminated. That day, Hurtado approved the termination, and Martinez signed the termination notice dated August 4, 2008. Plaintiff claims that Hurtado "carried out and facilitated unlawful retaliatory conduct against plaintiff, in concert with and at the recommendation of Martinez and with the knowledge and approval of Harris." *Id*. ¶ 57. On August 5, 2008, plaintiff and Solis were separately informed of plaintiff's termination, and plaintiff was escorted out of IDFPR offices. The next day, plaintiff filed a second Charge of

Discrimination, alleging retaliation for his complaints of discrimination.

## II. Analysis

Rule 12(b)(6) permits a court to dismiss a claim where a plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The court must accept as true the allegations of the complaint and draw all reasonable inferences in favor of plaintiff. *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007). To survive a Rule 12(b)(6) motion, "the complaint need only contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting Fed. R. Civ. P. 8(a)(2)). The facts must provide the defendant with "'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The plaintiff need not plead particularized facts, but the factual allegations in the complaint must be enough to raise a right to relief above the speculative level. *Id.*

### A. IDFPR, Martinez and Adams

IDFPR, Martinez and Adams move for partial dismissal, arguing that: (1) claims brought under 42 U.S.C. § 1983 against Martinez in his official capacity should be dismissed because, in such claims, a plaintiff may only seek prospective injunctive relief; (2)

certain requests for injunctive and declaratory relief should be stricken because plaintiff's status as a former employee precludes such relief; and (3) complaint paragraph 16 should be stricken because it describes conduct for which plaintiff cannot recover any relief.

In responding to defendants' first argument concerning § 1983 claims against Martinez in his official capacity, plaintiff make clear that his § 1983 claims are brought against Martinez only in his individual capacity. In light of this clarification, defendants' motion with respect to this issue is denied as moot.

Secondly, defendants argue that plaintiff, because he no longer is an employee of IDFPR, cannot seek injunctive and prospective relief against his former employer.[2] In his complaint, plaintiff asks that a declaratory judgment be entered against Martinez and Adams for violations of the First and Fourteenth Amendments as well as the Illinois State Officials and Employees Ethics Act. In light of the fact that plaintiff no longer works at IDFPR, defendants argue that there is no possibility that he could be the victim of defendants' alleged misconduct in the future. In

---

[2] Although defendants raise this argument in their opening brief, it is not clear if they abandoned this claim in their reply brief. *See* Defendants' Reply at 1 (stating, in the reply's introduction, that the defendants "request two alterations to the Complaint," which are then described as striking the § 1983 claims against Martinez in his official capacity and striking paragraph 16). Out of an abundance of caution, and in light of the fact that plaintiff responded to it, I will address this argument.

9

response, plaintiff points out that, if he successfully pursues his claims in this case, he may be reinstated. In light of this possibility, I conclude that plaintiff may include the request for a declaratory judgment in his prayer for relief.

Finally, defendants request that the court strike the allegations in complaint paragraph 16, which alleges acts and/or conduct pre-dating September 21, 2007. Federal Rule of Civil Procedure 12(f) allows a district court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." According to defendants, the acts described in paragraph 16 fall outside of Title VII's 300 day statute of limitations. In response, plaintiff argues that paragraph 16 is relevant to his non-Title VII claims, which have a two-year statute of limitations. And, with respect to the Title VII claim, he maintains that the acts described in paragraph 16 are relevant to his Title VII claim as "background evidence." I do not find that the acts described in paragraph 16 are "redundant, immaterial, impertinent or scandalous," Fed. R. Civ. P. 12(f), and therefore decline to strike paragraph 16.

**B. Harris**

**1. § 1983 Equal Protection**

In moving to dismiss the § 1983 Equal Protection claim against him, Harris argues that plaintiff fails to provide sufficient facts to support the necessary personal involvement required for

individual liability under § 1983.  *Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008).  To bring a § 1983 claim against Harris in his individual capacity, plaintiff must allege some personal participation by Harris in the alleged deprivation of his constitutional rights.  *See Payne ex rel. Hicks v. Churchich*, 161 F.3d 1030, 1039 (7th Cir. 1998) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation.").  "An official satisfies the personal responsibility requirement of section 1983 . . . if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge and consent."  *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982).  That is, he "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye . . . ."  *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988).

Viewing the allegations in the light most favorable to plaintiff, *Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002), plaintiff has provided sufficient allegations to show that Harris was personally involved in the alleged constitutional deprivation.  Plaintiff provides detailed allegations connecting Harris to the discriminatory and retaliatory actions experienced by plaintiff.  Specifically, through the memos written by plaintiff to Harris, as well as emails between Solis and

11

Harris[3], plaintiff provides support for his allegation that Harris knew of, and consented to, Martinez's course of discriminatory and retaliatory conduct (which culminated in plaintiff's termination)[4]. These allegations are sufficient to put Harris on notice of the claim against him. Harris's motion to dismiss this claim is denied.

### 2.  First Amendment Retaliation

To ultimately prevail in a First Amendment retaliation claim, a plaintiff must show that: (1) his speech was constitutionally protected; (2) he has suffered a deprivation likely to deter free speech; and (3) his speech was at least a motivating factor in the employer's action. *George v. Walker*, 535 F.3d 535, 538 (7th Cir. 2008) (citing *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006)). In moving to dismiss, Harris argues that plaintiff did not engage in constitutionally protected speech and that plaintiff has

---

[3]  Defendants argue that the fact that Harris immediately informed Martinez of plaintiff's charges against him show that Harris took appropriate action. However, those facts could certainly cut the opposite way. Viewing those facts in the light most favorable to plaintiff, as I must, those facts could support plaintiff's assertion that Harris was backing up Martinez's actions and that Harris went to Martinez with plaintiff's complaints in an attempt to figure out a way to silence plaintiff.

[4]  The fact that Harris was not in the office the day plaintiff was actually fired does not rule out the possibility, described by plaintiff, that Harris had already approved plaintiff's upcoming termination.

not sufficiently pled that his speech was a motivating factor in any of Harris's alleged acts.

The key issue here is whether or not plaintiff was acting as a concerned private citizen, or as a state employee, when he wrote the two memoranda to Harris. In *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006), the Supreme Court held that, for a government employee's speech to qualify for First Amendment protection, he must have been speaking "as a citizen on a matter of public concern." Public employees who speak pursuant to their "official duties" speak as employees rather than as citizens, and thus their speech is not protected by the First Amendment regardless of its content. *Id*. at 421-22. "The controlling factor in the *Garcetti* inquiry is whether the speech 'owes its existence to a public employee's professional responsibilities.'" *Callahan v. Fermon*, 526 F.3d 1040, 1044 (7th Cir. 2008) (quoting *Garcetti*, 547 U.S. at 421).

Plaintiff relies primarily on two cases where courts concluded that a public employee, who sent letters to state legislatures, acted as a private citizen and thus was protected by the First Amendment. In *Charles v. Grief*, 522 F.3d 508, 513-14 (5th Cir. 2008), the Fifth Circuit held that the plaintiff's speech was made as a private citizen where he sent letters to members of the Texas legislature raising concerns about racial discrimination, retaliation, misuse of state funds and other misconduct by the

13

Texas Lottery Commission. Concluding that the plaintiff acted as a private citizen, the court focused on the fact that the plaintiff, an employee of the Commission, ignored the chain of command and did not voice his complaints internally to supervisors (but rather complained to legislators who had oversight authority over the Commission). *Id*. at 514. The *Charles* court found, "[m]ost significantly, though, Charles's speech . . . was not made in the course of performing or fulfilling his job responsibilities, was not even indirectly related to his job, and was not made to higher-ups in his organization . . . but was communicated directly to elected representatives of the people." *Id*. Likewise, in *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006), the Seventh Circuit held that letters from the plaintiffs, who were public university employees, to various members of the Indiana legislature that alleged nepotism, discrimination, and other unlawful practices on the part of the university's dean were protected by the First Amendment (although the court ultimately found that the plaintiffs' claims failed because of a lack of causation).

I find these cases to be distinguishable from the case at bar. *Charles* and *Massey* share one obvious commonality – both plaintiffs, rather than complaining to supervisors, went outside the normal chain of command and voiced complaints directly to the state legislatures. Here, plaintiff lodged his complaints with Harris, who was within the normal chain of command. Bypassing his direct

supervisor, Martinez, and instead voicing complaints to Harris (Martinez's supervisor) makes perfect sense in light of the fact that the bulk of plaintiff's complaints were directed at Martinez. *See* Compl. ¶ 9 (stating that Harris had supervisory authority over Martinez). Unlike the plaintiffs in *Charles* and *Massey*, plaintiff did not voice his complaints to the Illinois legislature.

In addition to lodging his complaints within the normal chain of command, plaintiff's complaints sprung from, and were directly related to, the duties of his job as a supervisor at IDFPR. While it may be true, as plaintiff argues, that writing memoranda to the Governor's office was not part of his official job duties, it was within his job duties as an IDFPR employee to report potential misconduct, pursuant to the Policy and Procedure Manual. Compl. ¶ 66. Further, plaintiff's complaints were directly related to his job as a manager/supervisor, as most of the issues he raised concerned Pantoja and Espinoza, who were his subordinates. In light of the nature of the complaints and plaintiff's job as a supervisor at IDFPR, I conclude that the speech at issue here "owes its existence to [plaintiff's] professional responsibilities." *Garcetti*, 547 U.S. at 421.

Because plaintiff was speaking as a public employee and not as a private citizen when he wrote the memoranda, his speech is not protected by the First Amendment. *Garcetti*, 547 U.S. at 418; *Tamayo v. Blagojevich*, 526 F.3d 1074, 1092 (7th Cir. 2008)

15

(reporting alleged misconduct against an agency over which one has general supervisory responsibility is part of the duties of such an office). As a result, Harris's motion to dismiss this claim is granted.

### 3. Illinois State Officials and Employees Ethics Act

Section 15 of the State Officials and Employees Ethics Act ("Ethics Act"), 5 ILCS 430/1, *et seq.*, provides that:

> An officer, a member, a State employee, or a State agency shall not take any retaliatory action against a State employee because the State employee does any of the following: (1) Discloses or threatens to disclose to a supervisor or to a public body an activity, policy, or practice of any officer, member, State agency, or other State employee that the State employee reasonably believes is in violation of a law, rule, or regulation. (2) Provides information or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of law, rule, or regulation by any officer, member, State agency, or other State employee. (3) Assists or participates in a proceeding to enforce the provisions of this Act.

5 ILCS 430/15-10. Harris argues that this claim should be dismissed because plaintiff failed to plead any acts of retaliation attributable to Harris, and because plaintiff's allegations of race discrimination and retaliation are preempted by the Illinois Human Rights Act, 775 ILCS 5/1-102, *et seq*. ("IHRA").

With respect to Harris's first argument, I have already found that plaintiff has sufficiently pled that Harris participated in retaliatory acts towards plaintiff, including Harris's involvement in plaintiff's termination. Therefore, Harris's first argument for dismissal fails.

16

Turning to the issue of preemption, the IHRA states in pertinent part that "except as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than set forth in this Act." 775 ILCS 5/8-111(D). When an Illinois court lacks jurisdiction over a state claim, a federal court sitting in Illinois also lacks jurisdiction. *Thomas v. L'Eggs Prods., Inc.*, 13 F. Supp. 2d 806, 808 (C.D. Ill. 1998). Racial discrimination in the employment context is prohibited by the IHRA. 775 ILCS 5/2-102(a). Further, retaliation based on an individual's opposition to what he believes is unlawful discrimination based upon race is also prohibited by the IHRA. *See* 775 ILCS 5/6-101(A).

Implicitly acknowledging that retaliation based solely on race would be preempted by the IHRA[5], plaintiff responds by asserting that "the IHRA does not address retaliation for reporting non race-related violations of law or regulations, as [plaintiff] has clearly alleged here under the State Ethics Act." Resp. at 13. Plaintiff then goes on to list those allegations which support his statement. For instance, he points out that his April 16, 2008 memorandum to Harris references certain IDFPR employees as "ghost pay rollers." *Id*. Thus, independent of the national origin of the IDFPR employees, plaintiff, in objecting to ghost pay rolling, has

---

[5] In light of the fact that both parties agree, the court will assume that the IHRA preempts any claims of race-based retaliation supporting plaintiff's Ethics Act claim.

17

alleged a violation of a state law, rule or regulation. Such an allegation, if true, could certainly be the basis for an Ethics Act claim. Harris's motion to dismiss the Ethics Act claim is denied.

**III. Conclusion**

For all the foregoing reasons, defendant IDFPR, Martinez and Adams's partial motion to dismiss is denied. Harris's motion to dismiss is granted in part and denied in part.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: March 1, 2010