IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


REYNOLD BENJAMIN,                    )
                                     )
            Plaintiff,               )
                                     )
     v.                              )
                                     )   No. 09 C 5019
ILLINOIS DEPARTMENT OF FINANCIAL and )
PROFESSIONAL REGULATION, DEAN        )
MARTINEZ, JOHN HARRIS, and BRENT     )
ADAMS,                               )
                                     )
            Defendants.              )

## MEMORANDUM OPINION AND ORDER

Plaintiff Reynold Benjamin, a former supervisor at the
Illinois Department of Financial and Professional Regulation
("IDFPR"), filed an amended complaint against IDFPR and defendants
Dean Martinez, John Harris[1] and Brent Adams in their official and
individual capacities. Plaintiff, who is of Indian descent,
alleges he was retaliated against because he engaged in protected
activity, and discriminated against due to his race and national
origin. Plaintiff brings claims under Title VII of the Civil
Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII") for
race and national origin discrimination and retaliation (Counts I
and II, as to IDFPR), 42 U.S.C. § 1983 for violations of the
Fourteenth Amendment's Equal Protection Clause (Count III, as to
Martinez), and the Illinois State Officials and Employees Ethics

---

[1]  Defendant John Harris has since been dismissed from the
case. *See* Docket entry #104.

Act ("Ethics Act")(Count IV, as to IDFPR, Martinez and Adams).

Defendants do not move for summary judgment on the Title VII retaliatory termination claim in Count II. IDFPR's motion for partial summary judgment on Counts I and IV is granted in part and denied in part.[2] Martinez and Adams' motion for summary judgment on Counts III and IV is granted in part and denied in part.

## I.

Plaintiff is non-Hispanic and of Indian descent. He was hired on August 5, 2002 as the Supervisor of the Currency Exchange Section with the predecessor agency to IDFPR. On December 16, 2005, plaintiff was promoted to Assistant Director for the Bureau of Residential Finance in the Division of Banking, and reported directly to the Director of the Division, Jorge Solis, who is Hispanic. Defendant Martinez, who is Hispanic, is the former Secretary of IDFPR. John Harris, as then-Governor Blagojevich's Chief of Staff, had supervisory authority over Martinez. Defendant

---

[2] Defendants filed a motion to strike, which is denied. With the exception of deposition excerpts, defendants object to all of plaintiff's exhibits, including such documents as plaintiff's EEOC Charges and various emails between the individuals in this case, as unauthenticated. While it is true that these documents should have been properly authenticated with an affidavit attesting to their authenticity, I am not inclined to strike these documents. Having reviewed them, these documents may certainly be authenticated, if need be, at trial. Defendants made certain hearsay objections, but ultimately I did not rely on those facts which defendants claimed had hearsay problems. Finally, I note that defendants' complaint concerning plaintiff's penchant for including more than one factual statement in each numbered Rule 56 paragraph is well taken. This was improper. In light of the fact that defendants nonetheless responded to each statement, I will not strike these paragraphs.

Adams was the IDFPR's Director of Policy and reported directly to Martinez. Adams currently serves as the Secretary of IDFPR.

Many of the underlying allegations of this case center on two of plaintiff's subordinates at IDFPR, Mario Pantoja and David Espinoza. Both men are Hispanic. Beginning in 2007, plaintiff complained to his supervisor that Pantoja and Espinoza were receiving preferential treatment because they were Hispanic. Specifically, plaintiff often questioned the whereabouts of these two men and believed that Martinez improperly allowed workplace infractions to go unaddressed because Pantoja and Espinoza were Hispanic. In addition, he believed that Pantoja and Espinoza were permitted to bypass the normal chain of command and received other kinds of favorable treatment that non-Hispanics did not receive. As explained more fully below, plaintiff argues that the removal of his temporary assignment pay ("TAP") and bilingual pay was both discriminatory and retaliatory, and directly attributable to the complaints he made regarding preferential treatment of Hispanics at IDFPR.

While I will address facts as necessary in my analysis, a brief overview is necessary. On April 16, 2008, plaintiff sent John Harris (who admitted receiving the memorandum but was unsure as to the date), then chief of staff to then-Governor Blagojevich, a memorandum detailing the discriminatory and retaliatory treatment he was allegedly receiving at IDFPR under Martinez. Specifically,

plaintiff stated that Espinoza was "not qualified," was "never around" and had no knowledge of the mortgage industry.  Pl. Ex. at 25.  Plaintiff stated that Espinoza is protected by Martinez, is "never in the office" and is referred to as a "ghost payroller" by employees in other departments.  *Id*.  After receiving the memorandum, Harris met with Martinez concerning the memorandum.  When Martinez indicated that he planned on terminating plaintiff, Harris told him he could not.

Plaintiff argues that, in addition to the removal of TAP, removal of bilingual pay and his eventual termination, Martinez targeted him in other ways.  In the first quarter of 2008, Martinez told Solis that reliable sources informed Martinez that plaintiff had been out of the office performing other jobs or functions.  Martinez gave Solis a calendar, and told him to ask plaintiff where he was on certain specific days at certain specific times.  Martinez did not ask Solis to get this type of information from any other employees.  In March 2008, Adams requested and received transponder records relating to plaintiff's entry and exit from IDFPR parking garages.  Adams also requested timekeeping records for plaintiff from Human Resources, as well as I-Pass records for plaintiff.  On or around March 2008, Adams' attendance investigation was folded into a broader investigation regarding plaintiff's work.  Adams never found anything suggesting that

plaintiff had secondary employment or had any days off which were unapproved.

Plaintiff points to other allegedly retaliatory (and/or discriminatory) actions taken by Martinez. In May 2008, Martinez wanted plaintiff to move to the Thompson Center to work on a project involving 500 backlogged real estate investigations; plaintiff would report directly to Martinez.[3] Solis testified that plaintiff believed Martinez was using the project as a way to get rid of plaintiff.

On May 10, 2008, plaintiff attempted to send another memo to Harris, in which he advocated to remain in his position as Assistant Director and stated that Martinez was attempting to move plaintiff in retaliation for incidents involving Espinoza and Pantoja. Harris testified that he was informed of the memo's existence, but not any of its contents. On June 6, 2008, Solis informed Harris that he wanted to keep plaintiff in his position as Assistant Director. Harris then informed Martinez that he was not to move plaintiff to the Thompson Center. Later that same day, Martinez called Solis, upset that Solis had gone over Martinez's head and talked to Harris without Martinez's knowledge. Solis

---

[3] Plaintiff cites Exhibit 35, a memorandum he authored which purports to summarize a May 5, 2008 meeting plaintiff had with Martinez (concerning the move to the Thompson Center), to support his contention that Martinez threatened him by stating, "I could fire you if I want to and nobody can stop me" and "Watch what you say – your conversations get back to me." Martinez denies making this statement.

testified that Martinez was upset that he had chosen plaintiff over "two Latinos, Mario Pantoja and David Espinoza." Martinez threatened that Martinez would now run the Division of Banking, instead of Solis. That evening, Martinez had Solis's BlackBerry turned off and, around that same time, Solis's state-provided vehicle was taken away from him. Despite this threat and these actions taken by Martinez, Solis was not terminated.

On June 23, 2008, Martinez emailed Jessica Nunes of Human Resources, telling her to remove the bilingual portion of plaintiff's pay. Solis was not consulted in the decision to remove plaintiff's bilingual pay. According to defendants, the bilingual pay was removed because plaintiff did not satisfy the requirements for it.

On June 30, 2008, plaintiff filed a complaint with the Office of the Executive Inspector General ("OEIG") against Martinez, alleging hiring improprieties, nepotism, racial discrimination, possible ghost payrolling, political pressure to help in campaigns for Hispanic candidates and promotions to friends and relatives due to political affiliation. On July 17, 2008, plaintiff filed an EEOC charge against Martinez, alleging race and national origin discrimination and retaliation.

Martinez testified that at some point after he was notified of plaintiff's charge, but before plaintiff was terminated on August 4, 2008, Martinez "removed himself from the process" concerning

plaintiff's termination by abiding by whatever recommendation Adams made. Adams testified that he discussed a "course of action related to [plaintiff's] ongoing employment with the department" with Mireya Hurtado, deputy chief of staff in the Governor's office. On July 31, 2008, Adams emailed Hurtado, asking for authorization to terminate plaintiff, which Hurtado gave. On August 4, 2008 (effective August 5, 2008), plaintiff was terminated. The termination letter contains Martinez's signature and Martinez acknowledged that he was made aware of the letter at around the time it was issued to plaintiff. Plaintiff's termination letter did not articulate any reason for his termination. Solis, plaintiff's supervisor, testified that there was no work-related reason for plaintiff's termination. Defendants argue that plaintiff was fired for, among other things, perceived unavailability, missed meetings and poor performance. On August 5, 2008, plaintiff filed a second EEOC charge, alleging retaliation for his termination and a pattern of discriminatory and retaliatory conduct.

## II.

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Once

the moving party shows that there is no genuine issue of material fact, the burden of proof shifts to the nonmoving party to designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## A.    Claim I: Title VII Race and National Origin Discrimination and Retaliation Against IDFPR

### 1.    Retaliation

Title VII makes it unlawful for any employer to discriminate against an employee for opposing a practice made unlawful by that act. 42 U.S.C. § 2000e-3(a). A plaintiff bringing a retaliation claim can survive summary judgment in two ways: by means of either the direct or the indirect methods. *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Under the direct method, the plaintiff must establish a *prima facie* case by presenting direct evidence that: (1) she engaged in statutorily protected activity[4]; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two. *Luckie v.*

---

[4] Here, a reasonable jury could find that plaintiff has put forward evidence that he engaged in protected activity. In order to engage in protected activity, plaintiff needs to have a good faith belief that he is opposing a practice prohibited under Title VII. *See Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 752 (7th Cir. 2002). In 2007, prior to the removal of his TAP, plaintiff complained of and opposed discrimination that he believed was taking place at his workplace. Namely, he complained that Hispanics were receiving preferential treatment. Likewise, prior to the removal of his bilingual pay, plaintiff authored a memorandum in which he spelled out his belief that Hispanics were receiving preferential treatment. A reasonable jury could also find this to be protected activity.

*Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004). A plaintiff proceeding according to the direct method of proof may rely on two types of evidence: direct evidence or circumstantial evidence. *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005). "[D]irect evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Id.* (quoting *Eiland v. Trinity Hosp.*, 150 F.3d 747, 751 (7th Cir. 1998)). Circumstantial evidence is evidence that allows a jury to infer intentional discrimination by the decisionmaker. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). Plaintiff may prevail under the direct method, therefore, by "'showing an admission of discrimination' or by 'constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker.'" *Cole v. Ill.*, 562 F.3d 812, 815 (7th Cir. 2009) (quoting *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 771 (7th Cir. 2008)).

I must first determine which actions identified by plaintiff actually constitute materially adverse employment actions. The parties agree, and I concur, that the removal of plaintiff's TAP pay, the removal of his bilingual pay and his termination constitute adverse actions. I agree with defendants that the

remaining actions are not material enough to be actionable.[5]  With

respect to plaintiff's claims of retaliation, defendants have moved

for summary judgment on the Title VII retaliation claim in Claim 1

based on the removal of TAP and the removal of the bilingual pay.

Defendants have not moved for summary judgment on Claim II – Title

VII retaliatory termination.

In an effort to provide proof under the direct method,

plaintiff simply reiterates all the facts underlying his case and

argues, summarily, that such facts show that he was retaliated

against by Martinez because of his complaints.  Rather than address

every fact identified by plaintiff, I have instead identified those

---

[5]  While true that the Supreme Court has made clear that the
spectrum of actionable actions is broader in the retaliation
context than in the discrimination context, the antiretaliation
provisions of Title VII cover only those employer actions that
would have been materially adverse to a reasonable employee.  *See*
*Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53
(2006).  Any "delay" of plaintiff's TAP pay (which he ultimately
received retroactive to the date he began the database work) is not
actionable.  *See Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 301
(7th Cir. 2004).  Adams' investigation of plaintiff's time out of
the office is also not adverse.  The discussion plaintiff had with
Martinez about temporarily moving plaintiff to the Thompson Center
to clear out a backlog is not materially adverse, as it was only a
conversation and plaintiff was never actually moved.  An alleged
threat by Martinez that he could fire plaintiff, even if true, is
not an adverse employment action.  *Kerns v. Capital Graphics, Inc*.,
178 F.3d 1011, 1014-17 (8th Cir. 1999) (holding that a supervisor's
criticism and threat that the plaintiff could be fired did not
amount to adverse employment action).  Finally, the request that
plaintiff supply a doctor's note to justify his absence from a
meeting is not at all severe and cannot be considered adverse.  *See*
*Markose v. Ill. Dept. of Human Servs*., No. 03 C 3684, 2005 WL
233813, at *7 (N.D. Ill. Jan. 28, 2005).

facts which most strongly form a "convincing mosaic" of retaliation under the direct method.

In November 2007, plaintiff took on additional job duties with respect to a predatory lending database. As a result, Solis requested temporary assignment pay ("TAP") for plaintiff. On several occasions, Martinez delayed the approval of plaintiff's TAP. On December 13, 2007, when Solis inquired whether Martinez had received plaintiff's TAP document, Martinez forwarded the inquiry to Andy Fox, Martinez's then chief of staff, stating, "do not reply to him." Fox then responded to Martinez, "He doesn't know that you don't sign it and that I do. We still need a meeting with them both." Solis followed up with another email and a voicemail to Martinez. Martinez told Solis that he spoke to plaintiff, and that plaintiff had to speak to Fox to "clear the air on some minor issues" before they would process the TAP. According to plaintiff, plaintiff then spoke to Fox, who told him to get along with Espinoza and Pantoja because they were close to Fox and Martinez, and if he failed to do so, he would not get his TAP. Defendants deny that Fox made this statement.

On January 2, 2008, Martinez signed the form approving plaintiff's TAP. In a January 19, 2008 email from Martinez to Jeanine Hamm, Martinez ordered that plaintiff's TAP be removed. Plaintiff testified that "shortly before" Martinez removed his TAP, plaintiff had an interaction with Pantoja in which Pantoja

questioned why plaintiff removed a staff member from Espinoza's line of authority at a meeting. Benjamin Dep. at 200-01. Plaintiff informed Solis of this interaction, and also once again questioned the whereabouts of Pantoja and Espinoza. *Id*. at 199. Plaintiff also testified that he told Solis that Espinoza was never around, that Espinoza's staff complained that Espinoza did not have enough knowledge about the mortgage banking industry and that they could not get hold of him. *Id*. at 203.[6] Solis testified that plaintiff's TAP was removed in an unusual fashion, and he was kept of out the loop with regards to its removal. He also testified that there was no basis to remove plaintiff's TAP for his work on the predatory lending database.

Defendants respond to these facts by arguing that plaintiff has failed to put forward evidence that Martinez, who removed plaintiff's TAP, had knowledge of plaintiff's complaints about Espinoza and Pantoja prior to the removal of TAP. While he does not provide exact dates, Solis did testify that he had conversations *with Martinez* about the problems plaintiff had with Espinoza/Pantoja. Solis Dep. at 83-84.

---

[6] In plaintiff's April 16, 2008 Memorandum to John Harris, plaintiff also states that "[TAP] was granted, then one day after correcting Mario [Pantoja] and David [Espinoza] on an investigation on a Friday, Dean [Martinez] sends an email Saturday morning to payroll terminating the temp pay and [my] involvement of [sic] the database." Pl. Ex. 25 at RB113.

In light of the evidence submitted by plaintiff, I conclude that plaintiff has met his burden under the direct method of proof.[7]  Taken together, plaintiff has put forward evidence from which a reasonable jury could infer that plaintiff was retaliated against because of his protected activities.  Of course, defendants deny that these statements were made and argue that plaintiff was not actually entitled to TAP.  These are arguments they can make to a jury.  Plaintiff's evidence, combined with the fact that plaintiff's own supervisor testified that there was no reason for plaintiff's TAP to be removed, is sufficient to defeat defendants' motion for summary judgment.  In addition, there is evidence that plaintiff continued to voice his complaints concerning the

---

[7] Defendants attempt to make much of the fact that, in 2005, plaintiff had a dispute with his then-supervisor Michelle Latz, and that he told Martinez that he had spoken to the EEOC about his complaint of harassment by Latz.  Defendants argue that because Martinez knew of this complaint in 2005 and did not retaliate against plaintiff then, I should assume that he did not retaliate against plaintiff in 2007/2008.  Defendants likewise argue that the fact that Martinez hired and promoted plaintiff shows that he harbored no discriminatory animus.  I am not persuaded.  First of all, the case defendants rely on is inapposite.  In *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668 (7th Cir. 2011), the decisionmaker knew of plaintiff's protected complaints years before the decision to terminate was made.  Here, neither side attempts to explain what plaintiff was complaining about with respect to Latz.  There is no evidence that plaintiff was complaining in 2005 about Martinez's allegedly preferential treatment of Hispanics.  Furthermore, just because a supervisor did not discriminate or retaliate against an individual at one point in time does not mean that later discrimination or retaliation is foreclosed, especially in this case where plaintiff has put forward evidence that he began engaging in protected activity directed at Martinez.

preferential treatment Espinoza and Pantoja allegedly enjoyed, including during the period prior to the removal of his bi-lingual pay. The parties dispute why plaintiff had his bi-lingual pay removed, with defendants arguing that Martinez realized that plaintiff did not meet the requirements for it, and plaintiff arguing that it was removed because he refused to remain quiet regarding the preferential treatment of Hispanics. This too is a disputed issue of fact which will be resolved by the jury.

## 2. Discrimination

With respect to his discrimination claim, based on the removal of TAP and bilingual pay, plaintiff argues that he has sufficient evidence to proceed under both the direct and indirect methods of proof. Turning first to the direct method, plaintiff relies on many of the same arguments and facts underling his retaliation claim to support his claim of discrimination for being Indian and non-Hispanic.[8] While plaintiff has put forward evidence of a "convincing mosaic" of evidence supporting retaliation, he has not met that burden with respect to his discrimination claim. His

---

[8] Defendants argue that plaintiff based his discrimination claims on the fact that he is "non-Hispanic," and not on the fact that he is Indian. I disagree. Plaintiff identifies himself as Indian in his complaint and his complaint discusses discrimination based on race and/or national origin. Under "Cause of Discrimination Based On" in his EEOC Charge, plaintiff checked "national origin." The second page of the EEOC Charge goes on to state, "My national origin is Indian/non Hispanic/Latino." In addition, in his deposition, plaintiff makes clear that he believes he was discriminated against both because he is Indian and because he is non-Hispanic.

strongest piece of evidence is that Solis testified that Martinez accused him of choosing plaintiff "over two Latinos." He likewise recalls hearing Martinez tell a "dot head" joke at a Christmas party in 2006 or 2007. In addition to these two comments, plaintiff points out allegedly preferential treatment enjoyed by Pantoja and Espinoza[9], explains why the reasons given for the three adverse employment actions were pretextual and argues the timing of the TAP and bilingual pay were suspicious.

I start with plaintiff's strongest piece of evidence on discrimination – Martinez's comment regarding Solis's choosing plaintiff "over two Latinos." In addition, plaintiff asserts that Martinez told a derogatory "dot head" joke in plaintiff's presence either in 2006 or 2007. Even taking these two comments together, they are not strong enough indicators of Martinez's racial animus toward plaintiff. First, I note that Martinez's comment to Solis, while it may indicate generally that Martinez favors Hispanics, does not in any way reference any of the three adverse employment actions. *See Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006) (evidence that a decisionmaker generally favored hiring minorities does not prove under the direct method that any

_____

[9] Plaintiff asserts that Martinez advocated that Pantoja get "prime" office space when other, more senior employees did not. However, after complaints surfaced, Pantoja received the office only after he received a promotion. He also alleges that Espinoza and Pantoja's timekeeping records were not investigated as plaintiff's were.

particular decision he made was for discriminatory reasons). The Seventh Circuit has made clear that a comment may be considered "direct evidence of discriminatory intent where the statement was made around the time of and in reference to the adverse employment action." *Olson v. Northern FS, Inc.*, 387 F.3d 632, 635 (7th Cir. 2004). Because these statements cannot be read to reference any of the adverse actions alleged here, they are not sufficient under the direct method.

With respect to the rest of plaintiff's evidence, none of this circumstantial evidence points *directly* to a discriminatory reason for any of the adverse employment actions. Plaintiff's attempt to proceed on his discrimination claim under the direct method, therefore, fails.

When a plaintiff lacks direct evidence, he may utilize the burden-shifting method of proof established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The *McDonnell Douglas* framework requires the plaintiff to establish a *prima facie* case of discrimination by demonstrating that he: (1) belongs to a protected class, (2) performed his job to his employer's legitimate expectations, (3) suffered an adverse employment action despite performing satisfactorily, and (4) received less favorable treatment than similarly-situated employees outside the protected class. *Hildebrandt v. Ill. Dep't of Nat'l Res.*, 347 F.3d 1014, 1030 (7th Cir. 2003); *Hughes v. Brown,* 20 F.3d 745, 746 (7th Cir.

16

1994). If the plaintiff succeeds, the burden shifts to the defendant to provide legitimate, non-discriminatory reasons for its conduct; and if the defendant succeeds, the burden shifts back to the plaintiff to show that the defendant's reasons were pretextual. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 508 (7th Cir. 2004).

Defendant argues that plaintiff cannot meet the requirements of the indirect method because he cannot point to any similarly-situated employees who are outside the protected class and received more favorable treatment. In response, plaintiff points to Espinoza and Pantoja as his comparators. Unfortunately for plaintiff, these two individuals are not sufficiently comparable to plaintiff. While an employee need not show complete identity in comparing himself to a comparator, he must show "substantial similarity," *Radue v. Kimberly-Clark Co.*, 219 F.3d 612, 618 (7th Cir. 2000), and that someone is directly comparable to him in all material respects, *Greer v. Bd. of Educ. of City of Chicago, Ill.*, 267 F.3d 723, 728 (7th Cir. 2001). Employees are similarly situated when they have a common supervisor, *Radue,* 219 F.3d at 618, and common job descriptions. *See Pantoja v. Am NTN Bearing Mftg. Corp.*, No. 03 C 4961, 2005 WL 3542518, at *6 (N.D. Ill. Dec. 22, 2005) (employees with different job descriptions not similarly situated). Significantly, the three men had different positions and all had different supervisors. Further, there is no evidence that Martinez, who was the decisionmaker with respect to the

removal of plaintiff's TAP and bilingual pay, had any involvement in Pantoja or Espinoza's TAP or bilingual pay. *Radue*, 219 F.3d at 618 (where different decisionmakers are involved, individuals are rarely similarly situated). As a result, plaintiff's discrimination claims based on the removal of TAP and bilingual pay cannot survive summary judgment.

While they moved for summary judgment based on the removal of TAP and bilingual pay, defendants did not move for summary judgment on Count I based on discriminatory *termination*. According to defendants, Count I does not include a discriminatory termination claim; plaintiff argues that it does. I conclude that Claim I's reference to "terms and conditions" includes plaintiff's discriminatory termination claim. All prior allegations (some of which mention the termination) are incorporated into this claim, and plaintiff specifically mentions in Claim I that he is entitled to backpay (which would suggest he is including the termination claim). In the alternative, defendants ask that I allow them to incorporate by reference the arguments made by Martinez with respect to the discriminatory termination portion of the § 1983 claim. Because both sides had a full opportunity to address the Title VII discriminatory termination claim in the context of the discriminatory termination under § 1983, I will allow defendants to incorporate the § 1983 arguments. For all the reasons provided in

my § 1983 analysis, defendants' motion for summary judgment on plaintiff's discriminatory termination claim is granted.

**B.   Ethics Act Claim**

IDFPR, Adams and Martinez (in their official capacities) argue that the Eleventh Amendment bars plaintiff's Ethics Act claims.  In general, a state is immune from damages actions in federal court unless the state, by unequivocal language, waives the protections of the Eleventh Amendment or Congress unequivocally abrogates the state's Eleventh Amendment immunity.  *See Kroll v. Bd. of Trustees Univ. of Ill.*, 934 F.2d 904, 907-08 (7th Cir. 1991).  A state agency or state employee sued in his or her official capacity is treated the same as the state where, as here, money damages are sought.  *Id*.  Defendants argue that Illinois has not waived its Eleventh Amendment immunity to the Ethics Act.  By failing to present any argument to the contrary, plaintiff essentially concedes this point.  In light of this, plaintiff's Ethics Act claim against IDFPR, Adams and Martinez (in their official capacities), to the extent plaintiff seeks damages, is dismissed.  *See Block v. Ill. Secretary of State et al.*, No. 09 -117-DRH, 2010 WL 706043, at *3 (S.D. Ill. Feb. 24, 2010) (state agency has Eleventh Amendment immunity to claims brought under the Ethics Act).  Because the Eleventh Amendment does not foreclose claims for injunctive relief (and plaintiff requests injunctive relief here), plaintiff's Ethics Act claims based on plaintiff's request for

injective relief survive against IDFPR and Martinez (in his
official capacity).  As explained more fully below, the Ethics Act
claim against Adams not survive summary judgment.

Likewise, Adams and Martinez (in their individual capacities)
argue that they are also entitled to Eleventh Amendment immunity
because part of plaintiff's claims are really brought against the
state.  In other words, part of the relief plaintiff seeks (i.e.,
reinstatement with full benefits and seniority rights) can only be
effectuated by the state.  When considering whether a suit against
an individual is a suit against the state, courts look at the
requested relief and the issues involved.  *See Meyers v. Southern
Ill. Univ. Carbondale*, No. 08-CV-0556, 2009 WL 2046061, *4 (S.D.
Ill. July 10, 2009).  If a judgment for the plaintiff could operate
to control the action of the state, in effect it is a suit against
the state.  *See e.g., Turpin v. Koropchak*, 567 F.3d 880, 884 n.5
(7th Cir. 2009) (plaintiff who sought from a university, inter
alia, the awarding of her degree was a suit against the state, in
part due to the fact that the university would be able to confer
the degree).  Because reinstatement and the payment of backpay
would require an action by the state, neither Adams nor Martinez as
individuals could grant such relief.  *See Sakelaris v. Danikolas*,
No. 2:05-CV-158, 2007 WL 1832119, at *2 (N.D. Ind. June 22, 2007).

Further, the court should also consider whether the employee
acted beyond the scope of his authority and "whether the

complained-of actions involve matters ordinarily within the employee's normal and official functions of the State." *Id.* at 883. "When the Illinois courts speak of an 'act beyond the scope of authority,' they contemplate an employee acting not just in a wrongful *manner*, but sticking his nose in business where it doesn't belong." *Id.* The actions plaintiff alleges were taken by both Adams and Martinez were, although potentially discriminatory and/or retaliatory, still part and parcel of their jobs at IDFPR. *See id.* (university officials' blocking the degree of professor within scope of employment because it occurred only by virtue of their employment at the university: it "couldn't have been pulled off by any old person picked at random"). In light of this, plaintiff's Ethics Act claims against Adams and Martinez, in their individual capacities, to the extent plaintiff seeks reinstatement and back pay, are also dismissed. However, plaintiff's claims against Adams and Martinez, in their individual capacities, to the extent they are based on damages, are not barred by the Eleventh Amendment.

In addition to Eleventh Amendment immunity, Adams argues that he is entitled to summary judgment on the Ethics Acts claims (for both his official and individual capacities) because Adams was only aware of four possibly protected activities, and his decision to terminate plaintiff was not motivated by any of these four activities. Plaintiff provides no developed argument in response. He merely states, "The myriad ways in which Defendants retaliated

against Benjamin, described in Section I(A), were also retaliation for Benjamin's protected conduct under the Ethics Act." Pl.'s Resp. at 29. Plaintiff makes no attempt to refute or even address any of the arguments raised by defendants. He provides no explanation or analysis as to why or how certain activities (discussed in the context of Title VII discrimination and retaliation) satisfy the requirements of the Ethics Act. It is not the job of this court to develop arguments for a party. Because plaintiff has essentially provided no argument at all in response to defendants' motion, summary judgment is granted on the Ethics Act claim against Adams.

Unlike Adams, Martinez does not make any arguments in his motion, beyond the Eleventh Amendment argument addressed above, that the Ethics Act claim against him fails. Thus, plaintiff's Ethics Act claim survives against IDFPR and Martinez (in his official capacity) based on plaintiff's request for injunctive relief. Plaintiff's Ethics Act claim survives against Martinez to the extent plaintiff seeks compensatory and punitive damages. *See Maes v. Folberg*, 531 F. Supp. 2d 956, 957 (N.D. Ill. 2007) (concluding that plaintiff may seek punitive damages under Ethics Act).

**C.    § 1983 Claim Against Martinez**

Plaintiff asserts discrimination and retaliation Equal Protection claims under 42 U.S.C. § 1983 against Martinez in his

22

official capacity. A § 1983 Equal Protection discrimination claim has the same liability standards and analysis as claims brought under Title VII. *Burks v. Wisc. Dept. Transp.*, 464 F.3d 744, 751 n.2 (7th Cir. 2006). Therefore, I incorporate my Title VII discrimination and retaliation analyses (with respect to TAP and bilingual pay) provided above and apply it equally here to plaintiff's § 1983 claim.

Unlike defendants in the Title VII analysis, Martinez moves for summary judgment on plaintiff's discriminatory and retaliatory termination claims. Beginning first with the discriminatory termination claim, Martinez argues that plaintiff's claim fails under the direct and indirect methods of proof. Rather than put forward arguments supporting either the direct or indirect methods, plaintiff merely argues that certain of Martinez's arguments are not persuasive. Plaintiff fails in his burden of coming forward with argument and evidence to support his discriminatory termination claim. As a result, Martinez's motion for summary judgment on plaintiff's discriminatory termination claim under § 1983 is granted.

However, plaintiff's retaliatory termination claim survives. In addition to the protected activities described earlier, plaintiff engaged in other protected activities prior to his August 4, 2008 termination. Plaintiff's April 16, 2008 memo to John Harris, his June 30, 2008 complaint to OEIG, and his July 17, 2008

EEOC Charge were all protected activities. I conclude that the proximity of his termination to these complaints, coupled with the evidence presented supporting an inference of retaliation discussed in greater detail above, is sufficient for this claim to survive summary judgment. Further, I conclude that there is sufficient evidence suggesting that Martinez was involved in the decision to terminate plaintiff. I do not believe that the additional arguments raised by Martinez leads to a contrary conclusion. Martinez's motion for summary judgment on plaintiff's retaliatory termination claim under § 1983 is denied.

## III.

For all the foregoing reasons, IDFPR, Martinez and Adams's motion for partial summary judgment [117] on Counts I and IV is granted in part and denied in part. Martinez and Adams' motion for summary judgment [111] on Counts III and IV is granted in part and denied in part. Defendants' motion to strike [139] is denied.


**ENTER ORDER:**

_Elaine E. Bucklo_

**Elaine E. Bucklo**
United States District Judge


Dated: August 8, 2011